**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| KEVIN ANDERSON,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>BDO USA, P.C.,<br><br>　　　Defendant. | Civil Action No. 24-2421 (JEB) |

**MEMORANDUM OPINION**

Plaintiff Kevin Anderson's decades-long career as a tax professional at Defendant BDO USA came to an abrupt end in December 2023, when he was fired for refusing to shift his compensation from salaried to hourly pay. He was 70 years old at the time. This lawsuit followed shortly thereafter, with Anderson alleging one count of age discrimination in violation of the D.C. Human Rights Act. Now, with discovery completed, his former employer moves for summary judgment, contending that Anderson has not earned his day before a jury. This Court disagrees and will therefore deny BDO's Motion.

**I.      Background**

Because the Court is considering Defendant's Motion for Summary Judgment, it will construe the facts in the light most favorable to Plaintiff. Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).

Anderson began working at BDO nearly two decades ago in 2007 and served for many years as a Partner in the firm's National Tax Office Advisory (NTO-A) practice — specifically, within the Corporate subgroup. See ECF Nos. 20 (Def. Statement of Undisputed Material Facts

1

(Def. SUMF)), ¶¶ 2, 4; 28 (Pl. Statement of Undisputed Material Facts (Pl. SUMF)), ¶¶ 2, 4. That office provides the rest of the firm with "technical guidance, interpretive analysis, and subject-matter expertise," operating as a sort of internal consultancy on tax matters. See Def. SUMF, ¶ 3; Pl. SUMF, ¶ 3. When he turned 65 in 2019, Anderson retired from the partnership and became a salaried employee of the firm, changing his title to Managing Director but staying with the NTO-A Corporate group. See Def. SUMF, ¶ 7; Pl. SUMF, ¶ 7. In that role, he collected an annual salary of $525,000. See Def. SUMF, ¶ 34; Pl. SUMF, ¶ 34.

Around 2023, leadership within BDO began to shift toward younger generations. Anderson's former supervisor, Randy Schwartzman, who managed the Corporate subgroup within NTO-A, retired and was replaced by Kevin Ainsworth, 39 years old. See Def. SUMF, ¶ 16; Pl. SUMF, ¶ 16. Ainsworth reported up to the new head of NTO-A, Jeff Bilsky, 55 years old, who had recently replaced Andy Gibson, 66. See Def. SUMF, ¶ 12; Pl. SUMF, ¶ 12. Bilsky in turn reported to Hoon Lee, 50, for whom a new position had recently been created: Tax Managing Principal, West & National Tax Office. See Def. SUMF, ¶ 12; Pl. SUMF, ¶ 12. Things remained stable at the very top of the firm: Lee himself reported to Matt Becker, also 50, who had previously been and remained the head of BDO's Tax Group. See Def. SUMF, ¶¶ 6, 12; Pl. SUMF, ¶¶ 6, 12. To summarize, starting in 2023, Anderson's chain of reporting went from Corporate supervisor Ainsworth to NTO-A head Bilsky, to Tax Principal Lee, to Becker, the head of Tax. Our case deals primarily in the middle rungs of the ladder with Lee and Bilsky.

Here, the parties' accounts begin to conflict. Defendant asserts that once Lee and Bilsky joined the leadership team, they made it clear to NTO-A that billable hours were a major emphasis for the firm. See Def. SUMF, ¶ 16. Anderson conversely points out that BDO cannot identify a single contemporaneous record emphasizing productivity or stating the company's

expectations for billable hours or utilization rates.  See Pl. SUMF, ¶ 14.  Returning to what is undisputed: after they took over, Lee and Bilsky circulated some presentations that generally emphasized four pillars of performance — "client service, market prominence, quality and risk management, and thought leadership."  Def. SUMF, ¶ 14; see also Pl. SUMF, ¶ 17. Unsurprisingly, the parties disagree about what employees should have taken away from these presentations.  See Def. SUMF, ¶ 14; Pl. SUMF, ¶ 17.

In January 2023, Becker told a client in an email that Anderson "is not ready to fully retire and yet for the firm the right time for him to retire from BDO is soon."  ECF No. 29-5 (Jan. 2 Email) at ECF p. 3.  Then, while forwarding the thread to Lee and Bilsky, Becker wrote that he thought that they should "give Kevin a nudge" toward retirement.  Id. at ECF p. 2.  Lee responded, "Yes, we can definitely provide a 'nudge.'"  Id.

After a few months of quiet, Ainsworth met with Anderson in May for an annual performance review, at which time Plaintiff communicated that he had no plans to "change anything" regarding his work schedule.  See Def. SUMF, ¶¶ 20–21; Pl. SUMF, ¶¶ 20–21. Following that conversation, Bilsky gave him a rating of "Successful" on his performance review, the second-highest possible rating behind "Fantastic."  ECF Nos. 22-18 (Performance Review Spreadsheet) at ECF p. 5; 22-3 (Lee Tr.) at 71:3–:14.  On the supervisor report that compiled feedback on various employees, Anderson was noted as "doing what we are asking him to do."  Performance Review Spreadsheet at ECF p. 5.  That year, Anderson logged roughly 590 billable hours, a decline from the 783 and 706 hours he had billed the two previous years. See Def. SUMF, ¶ 26; Pl. SUMF, ¶ 26.  This left him with a utilization rate (the ratio of billable work to total hours worked) of 28.3% (which some records alternatively list as 29.3%).  See Performance Review Spreadsheet at ECF p. 5.  For comparison, the four other Managing

3

Directors in the Corporate subgroup in the NTO-A practice achieved utilization rates of 49.2%, 48.1%, 39.2%, and 34.2%. Id. Of those five employees, Anderson and one other person received ratings of "Successful," while the other three received a lower rating of "Keep Developing." Id. More broadly, out of 28 Managing Directors across the NTO-A office, only one received a rating of "Fantastic." Id.

Around that fall, Bilsky and Lee began discussing plans to "move Kevin to [a] part-time schedule" where he would "be compensated on an hourly rate for all approved time." ECF No. 22-24 (Oct. 18 Email) at ECF p. 2. Billable work would be "[a]utomatic[ally] approved," but other work would require "pre-approval." Id. In one budgeting spreadsheet, Bilsky anticipated that Anderson's compensation would drop by roughly $385,000 under the new arrangement and that he would be employed on a "[r]educed work schedule." ECF No. 29-7 (Oct. 20 Email) at ECF p. 3.

That plan was then unveiled to Anderson in November. On November 3, Lee and Bilsky met with him and proposed shifting him to an hourly pay structure, with all the restrictions on nonbillable work detailed above. See Def. SUMF, ¶¶ 42–44; Pl. SUMF, ¶¶ 42–44. Later, the proposal was updated to include a 20-hours-a-week cap, which the firm said was necessary if Anderson wanted to begin receiving retirement benefits from his time as a Partner. See Def. SUMF, ¶ 47; Pl. SUMF, ¶ 47. After ample, yet minimally productive, back and forth, Lee and Bilsky sent Anderson an email on December 11 informing him that because he had not agreed to the compensation change, he would be terminated effective January 1, 2024. See ECF No. 22-33 (Dec. 11 Email) at ECF p. 2. The end of the saga came even earlier than expected, however — on December 20, Anderson sent a heated email to BDO leadership asserting that he had been

4

wrongfully pushed out of the firm.  See ECF No. 22-34 (Dec. 20 Email) at 1–2.  His termination was then made effective that same day.  See Def. SUMF, ¶¶ 60–61; Pl. SUMF, ¶¶ 60–61.

Anderson initiated this lawsuit in D.C. Superior Court, alleging one count of age discrimination under the D.C. Human Rights Act.  See ECF No. 1-1 (Compl.), ¶¶ 26–37.  Invoking diversity jurisdiction, BDO removed the case to this Court.  See ECF No. 1 (Not. of Removal) at 1.  It then filed a motion to dismiss, which the Court denied.  See ECF Nos. 5 (MTD); 9 (MTD Mem. Op.) at 9.  The case has since progressed through discovery, and BDO now brings this Motion for Summary Judgment.  See ECF No. 19-1 (MSJ).

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S.

at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington

Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*).  The court must "eschew making

credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363

(D.C. Cir. 2007).  The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant,

in other words, is required to provide evidence that would permit a reasonable jury to find in his

favor.  Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.    Analysis

BDO contends that several defects in Anderson's case should lead this Court to grant its

Motion for Summary Judgment.  The Court will first lay out the governing legal framework

before reviewing each of these assertions in turn.

### A.    Legal Framework

The DCHRA prohibits an employer from terminating an employee "wholly or partially"

on the basis of that employee's age.  See D.C. Code § 2-1402.11(a)(1)(A).  To state a *prima facie*

claim for age discrimination under that statute, a plaintiff must allege that: "1) he is a member of

a protected class; 2) he suffered an adverse employment action; and 3) the circumstances give

rise to an inference of discrimination."  Kumar v. D.C. Water & Sewer Auth., 25 A.3d 9, 17

(D.C. 2011).

When analyzing age-discrimination claims under the DCHRA, courts "employ the same

three-part, burden-shifting test articulated by the Supreme Court for Title VII cases."  Cain v.

Reinoso, 43 A.3d 302, 306 (D.C. 2012) (quoting Hamilton v. Howard Univ., 960 A.2d 308, 314

(D.C. 2008)).  Under that framework, once a plaintiff has made out a *prima facie* showing of

discrimination, a defendant may rebut it by offering up a "legitimate, nondiscriminatory reason"

for the adverse employment decision.  Stoe v. Barr, 960 F.3d 627, 639 (D.C. Cir. 2020) (quoting

Holcomb, 433 F.3d at 896).  The burden then returns to the plaintiff, who must show that "the

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

discrimination."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting

Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981)).

Typically, at summary judgment, once an employer has asserted a legitimate, non-

discriminatory reason for its decision, "the district court need not — and should not — decide

whether the plaintiff actually made out a *prima facie* case."  Brady v. Off. of Sergeant at Arms,

520 F.3d 490, 494 (D.C. Cir. 2008); see also Hamilton, 960 A.2d at 314 ("Since [employer]

produced evidence that it suspended and terminated [employee] for a legitimate, non-

discriminatory reason, we need not analyze whether plaintiffs made out a *prima facie* case

of . . . age discrimination.").  Instead, pretext merges with the "ultimate question" of

discrimination, and the court need focus on only that inquiry in deciding the motion: has the

plaintiff offered "sufficient evidence for a reasonable jury to find that . . . age discrimination

actually motivated the employer's decision"?  Hamilton, 960 A.2d at 314 (cleaned up).

Despite using the Supreme Court's burden-shifting framework, the DCHRA employs a

more forgiving causation standard than its federal counterpart.  Although the Supreme Court held

in 2009 that age-discrimination claims brought under the federal Age Discrimination in

Employment Act against private employers must be proven under a but-for causation standard,

Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 180 (2009), the D.C. Court of Appeals has

continued to employ a substantial-factor causation standard for DCHRA claims.  Cain, 43 A.3d

at 306 (quoting McFarland v. George Washington Univ., 935 A.2d 337, 352 (D.C. 2007)); Rose

v. United Gen. Contractors, 285 A.3d 186, 197 (D.C. 2022) (interpreting governing text for all

DCHRA discrimination claims to require substantial-factor causation). "A 'substantial factor'

means that the protected characteristic was a significant motivating factor bringing about the

employer's decision." Rose, 285 A.3d at 197 (quoting Scrivener v. Clark Coll., 181 Wash. 2d

439, 444 (Wash. 2014) (*en banc*)).

B.      Threshold Issues

Anderson asserts that he was a victim of age discrimination: he was forced out of his job

with an undesirable take-it-or-leave-it compensation change, and his age — 70 at the time —

played a significant role in those events. See Compl., ¶¶ 26–37.  BDO's primary response is that

it changed his compensation because he was underperforming, not because he was old. See MSJ

at 23.

Now that BDO has offered up a legitimate, nondiscriminatory reason for its conduct, the

Court would normally bypass the *prima facie* analysis and proceed straight to the ultimate

question of discrimination. Brady, 520 F.3d at 494.  Here, however, the company also maintains

that the employer conduct at issue — Anderson's compensation change — does not constitute an

adverse employment action. Brady's shortcut gets a little longer in these scenarios. The D.C.

Circuit has indicated that when an employer "contests whether [the plaintiff] suffered an adverse

action," the court should analyze that prong of the *prima facie* case, even if the employer has

already offered up an alternative explanation for its actions. Baloch v. Kempthorne, 550 F.3d

1191, 1196–97 (D.C. Cir. 2008) (conducting adverse-employment-action analysis at summary

judgment when employer raised issue); see also Nurriddin v. Bolden, 40 F. Supp. 3d 104, 119

(D.D.C. 2014) (same); Webster v. U.S. Dep't of Energy, 443 F. Supp. 3d 67, 79 (D.D.C. 2020) (same).

Thankfully, this pit stop is quick.  An adverse employment action is one that causes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Kumar, 25 A.3d at 17 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  Whether an action is adverse "is generally [considered] a jury question."  Czekalski, 475 F.3d at 365.  Anderson contends that by moving him to an hourly pay scale and limiting compensation for nonbillable work, BDO effectively reduced his income for working the same hours with the same proportion of billable/nonbillable work — essentially, same work, less pay.  See ECF No. 27 (Opp.) at 9–11.  BDO suggests that this Court should reject that stance as a matter of law; in its view, Anderson could have made more money under the new arrangement if he just billed more.  See MSJ at 15.  That contention is belied by BDO's own documented expectations.  Bilsky himself calculated that Anderson's pay would decrease by over $385,000 under this new arrangement and predicted that he would be working on a "[r]educed" schedule.  See Oct. 20 Email at ECF p. 3.  BDO also eventually proposed capping his hours at 20 per week, making higher pay impossible.  See Def. SUMF, ¶¶ 43, 47; Pl. SUMF, ¶ 45.  Drawing inferences in Anderson's favor, a jury could certainly find that the compensation proposal suffices as a "materially adverse" modification to the conditions of his employment.  Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002).

Further, an astute reader may have noticed that Anderson technically suffered not one but two adverse employment actions: the forced compensation change and his ultimate firing.  In general, compensation changes and terminations are treated as distinct adverse actions, even

9

when they are related to the same underlying facts.  Cesarano v. Reed Smith LLP, 990 A.2d 455, 464 (D.C. 2010) (noting importance of delineating employment actions for time-bar-calculation purposes).  In this case, however, the Court finds that conducting separate analyses of discrimination would be redundant.  Anderson was fired because he refused to accept BDO's hourly-pay proposal, so the new pay structure never actually took effect; the body of evidence for the two events is thus largely one and the same.  Indeed, the parties themselves treat the two actions as one general act of discrimination.  See Compl., ¶¶ 29–31 (asserting single count of age discrimination when BDO "terminat[ed] [Anderson] . . . after he refused to agree to [the new] compensation arrangement"); MSJ at 20 ("Anderson was only terminated after he refused to accept this change to his compensation.").  Following in their footsteps, the Court will analyze the two actions in conjunction, focusing primarily on the compensation change.  BDO, at times, also hints that the acceleration of the effective date of Anderson's termination — from early January to late December — may serve as another battleground for the parties.  See MSJ at 27–28.  This is a nonissue; Plaintiff never alleged that the acceleration of the termination was itself an instance of age discrimination.  See Compl., ¶¶ 29–31.

C.      Application

Having cleared away the brush, the Court is now free to proceed to the central question at hand: did Anderson offer up sufficient evidence such that a reasonable jury could conclude that age discrimination played a substantial role in his compensation change?

Evidence of discrimination can take on a variety of forms.  A jury can infer discrimination from facts that "attack the employer's proffered explanation for its actions" as well as from "the plaintiff's *prima facie* case" and "any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or

attitudes on the part of the employer) or any contrary evidence that may be available to the

employer (such as evidence of a strong track record in equal opportunity employment)." Cain,

43 A.3d at 313 (quoting Furline v. Morrison, 953 A.2d 344, 353–54 (D.C. 2008)) (internal

quotation marks omitted).  Here, the Court will sort the relevant facts into two buckets:

"evidence showing that [BDO's] explanation is 'false'" and evidence that BDO's "'real

motivation was discriminatory.'"  Mulrain v. Donovan, 900 F. Supp. 2d 62, 68 (D.D.C. 2012)

(quoting Aka, 156 F.3d at 1289 n.3).  It considers each in turn.

### 1.    *Pretext*

The falsity of an employer's explanation can serve as significant evidence of

discrimination.  Because "the employer is in the best position to put forth the actual reason for its

decision," Reeves, 530 U.S. at 147, when the only provided explanation for its course of conduct

has been rebutted, "the jury is permitted to search for others, and may in appropriate

circumstances draw an inference of discrimination." Aka, 156 F.3d at 1292; see also Furnco

Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978) ("[W]hen all legitimate reasons for [the

employer's actions] have been eliminated . . . , it is more likely than not the employer, who we

generally assume acts only with some reason, based his decision on an impermissible

consideration.") (emphasis removed); Burdine, 450 U.S. at 256 (plaintiff may prove

discrimination "by showing that the employer's proffered explanation is unworthy of credence");

Brady, 520 F.3d at 496 n.4 (finding that "discrediting an employer's asserted reason is often

quite probative of discrimination").

BDO asserts that Anderson was moved to hourly pay because his productivity "fell far

short of expectations."  MSJ at 23.  Specifically, it highlights his declining billable hours and his

low utilization rate of 28.3%, well below the 50% threshold that BDO claims is the bare

11

minimum for its employees.  Id. at 25.  Poor work performance is certainly a legitimate, nondiscriminatory reason to demote or terminate an employee.  Rose, 285 A.3d at 195.  The question is whether underperformance was the actual catalyst behind BDO's actions.

Plaintiff concedes the cold hard numbers: his billable hours indeed declined over the last few years and his utilization rate was indisputably under 30% in 2023.  See Def. SUMF, ¶ 26; Pl. SUMF, ¶ 26.  He rightly points out, however, that these figures mean little without context.  For instance, in a company where target utilization rates are 20%, Anderson would have been performing above and beyond.  In a company where senior employees are expected to do less billable work and more mentoring, Anderson's declining hours would be expected, maybe even desirable.  In other words, the statistics themselves do not inherently indicate good or bad performance.  That depends entirely on what BDO's expectations were.  On this front, Anderson posits that BDO's 50% utilization-rate requirement and billable-hour expectations were pretextual *post hoc* inventions, rather than actual company benchmarks in place at the time of his employment.  See Opp. at 2.  The Court finds that a reasonable jury could conclude exactly that from the record.

Despite claiming that "BDO never wavered in its emphasis on the importance of billable hours and utilization rates" and that the 50% target "was not new to anyone within NTO-A," MSJ at 23, 25, the firm cannot identify a single instance in the record documenting any such communication of these requirements.  It points to some circulated presentations that speak in broad strokes about the importance of client services, but none of those slide decks specifies utilization targets or billable-hour expectations, or even mentions utilization rates at all.  Id. at 23–24.  For all its talk of "clear expectations," id. at 25, BDO is conspicuously short on proof.

12

In addition to the dearth of support, its account of the facts is perhaps even contradicted by some record evidence. The company suggests that because the Corporate subgroup "consistently faced significant work demands," and Anderson was a senior employee, he could have been expected to achieve a utilization rate in the 60% to 70% range, above the company's 50% benchmark. Id. at 2, 23. Yet not a single Managing Director in the Corporate subgroup hit even a 50% utilization rate. See Performance Review Spreadsheet at ECF p. 5. One might expect that if this benchmark were a company or practice-group requirement, it would be a goal that at least some employees aimed for and achieved — or, at the very least, a noticeable shortcoming that BDO would document in its feedback. Not so: low utilization is never mentioned in any of the notes for the Corporate employees. Id. In fact, the performance ratings appear to have little correlation to productivity at all: Anderson and the other employee who achieved "Successful" ratings had utilization rates of 28.3% and 48.1%, while the three who received a lower "Keep Developing" rating had rates of 49.2%, 39.2%, and 34.2%. Id. BDO argues that Anderson did not receive the highest rating — "Fantastic" — "because of his low client billable hours and utilization rate." MSJ at 6. This is hard to believe when the only Managing Director in the NTO-A group who obtained such a rating worked fewer total hours than Anderson, billed fewer hours than Anderson, and had a utilization rate of 23.1%. See Performance Review Spreadsheet at ECF p. 5. In sum, a jury could well find that productivity was not the metric on which BDO employees were evaluated.

Further, the record contains no indication that BDO ever alerted Anderson to the fact that he was performing below expectations. It is true that Plaintiff's self-perception is not inherently relevant — i.e., an employee does not need to know that he was underperforming for that to be the real reason behind his employer's actions. See Ajisefinni v. KPMG LLP, 17 F. Supp. 3d 28,

13

41 (D.D.C. 2014).  But whether Anderson was ever informed that he had performance issues bears on the question of whether BDO's justification is genuine or invented after the fact.  One would expect that if productivity had been an issue — especially a persistent issue, like BDO alleges here, see MSJ at 25 — the first step would have been to alert Anderson to change his behavior.  Instead, all the feedback he received up until November 2023 indicated that he was meeting expectations.  See, e.g., ECF No. 28-2 (Anderson Tr.) at 328:6–:20 ("[Practice leader] told me that I did not have to be concerned about the number of billable hours . . . I was generating, because [he] fully recognized the other significant contributions . . . I was making to the firm.").

During Anderson's May 2023 performance review, Bilsky gave him a positive rating of "Successful."  Performance Review Spreadsheet at ECF p. 5; Lee Tr. at 71:3–:14.  While management left notes like "utilization is low" on other employees during that performance cycle, there was no such description for Anderson.  See Performance Review Spreadsheet at ECF p. 5.  Instead, they wrote that he "is doing what we are asking him to do."  Id.  This significantly undercuts BDO's underperformance explanation.  Washington Convention Ctr. Auth. v. Johnson, 953 A.2d 1064, 1068, 1074 (D.C. 2008) (denying summary judgment when positive performance review rebutted employer's explanation for termination); George v. Leavitt, 407 F.3d 405, 414 (D.C. Cir. 2005) (finding "genuine issue as to [plaintiff's] performance and conduct" when termination was preceded by positive performance review).

Defendant argues that Anderson's years as a working professional should have alerted him to the necessity of billing; he did not need to be told.  See MSJ at 24.  At this juncture, the Court will not draw that inference on BDO's behalf.  Anderson stated that he believed that he was doing what was expected of him, and nothing in the record indicates that BDO ever disputed

14

that self-perception. See Anderson Tr. at 327:17–328:5 (Q: "[W]ere you ever told that you needed to increase your utilization rate or your billable hours?" A: "No, I was not."); Lee Tr. at 121:15–122:19 (Lee stating that Bilsky led productivity conversations with Anderson); ECF No. 22-5 (Bilsky Tr.) at 59:6–:11 (Bilsky stating, "I know definitively that I was not part of conversations within the corporate practice [about Anderson's billable hours]").

As every working person is aware, and as the law fully respects, employers have the right to set their own expectations in the workplace. Those expectations must actually be in place, however, before they can serve as the basis for an employer decision. An employer cannot fire someone for wearing a hat to the office on Monday, institute a hat ban on Friday, and then say that was the basis of the Monday firing. So too here. BDO is certainly permitted to require a 50% utilization rate from its employees. But based on the current record, a jury could conclude that such an expectation was never set with Anderson or the NTO-A group, and that Anderson was not underperforming by any benchmarks known to him or the company. Such jury could thus infer that BDO's rationale was pretextual and manufactured after the fact.

At the same time, the burden remains with Anderson to prove not only that BDO's proffered reason is false, but that discrimination is the real reason for its actions. The Court will thus proceed to consider his affirmative evidence of age discrimination, which Defendant contends is lacking. See ECF No. 31 (Reply) at 7.

### 2. *Evidence of Animus*

To be sure, Anderson has not mustered together the strongest army of facts on this front. The Court nonetheless finds that they suffice to survive summary judgment.

First, Plaintiff points to the younger ages of the supervisors who fired him — 50 and 55 for Lee and Bilsky, respectively — as well as the younger ages of the workers who eventually

15

took over his duties, ranging from late twenties to early fifties.  See Opp. at 11–12, 14.  Courts have accepted the existence of both younger decisionmakers and younger replacement workers as evidence that could support a claim of age discrimination.  Martin v. Ross, 6 A.3d 860, 862 (D.C. 2010) (younger replacement); O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996) (same); Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 431 (1st Cir. 2000) (younger decisionmaker).  This evidence, however, is not particularly conclusive; while younger replacement employees can raise an inference of discrimination, their presence does not alone prove discrimination.  See Dunaway v. Int'l Bhd. of Teamsters, 310 F.3d 758, 767 (D.C. Cir. 2002).  The Court nonetheless takes these facts into account.

Next, Anderson points to an email exchange in January 2023 that he alleges featured discriminatory comments by Lee and Becker.  In the thread, Becker told a third party that he "suspect[s] [Anderson] is not ready to fully retire and yet for the firm the right time for him to retire from BDO is soon."  Jan. 2 Email at ECF p. 3.  Then, he forwarded that exchange to Lee and Bilsky, his direct report and skip-level report, see Pl. SUMF, ¶ 12, and told them that they should consider giving Anderson a "nudge" toward retirement because "Anderson's 'safe space' at BDO is disappearing."  Jan. 2 Email at ECF p. 3.  Lee agreed.  Id.  A few months later, Lee and Bilsky began making plans to change Anderson's compensation plan.  See Oct. 18 Email at ECF pp. 2–3.

Comments surrounding retirement and age can be tricky to parse.  Age-discrimination statutes prohibit employers from evaluating older employees based on stereotypes about "productivity and competence declin[ing] with old age."  Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).  For example, courts in this district have deemed the following remarks to be derogatory: calling an employee "too old to work," Robinson v. Red Coats, Inc., 31 F. Supp. 3d

16

201, 216 (D.D.C. 2014); stating that the department "would be a lot better off as soon as [supervisor] got rid of these old people," Daniels v. Tapella, 571 F. Supp. 2d 137, 144 (D.D.C. 2008); or commenting that certain employees were "over the hill." Threadgill v. Spellings, 377 F. Supp. 2d 158, 164 (D.D.C. 2005). At the same time, mere commentary about issues that happen to correlate with age, like pension status or retirement, is not necessarily derogatory. Hazen Paper Co., 507 U.S. at 611–13. Courts have brushed off the following colloquies as harmless: pointing out that the employee "can retire," Johnson v. District of Columbia, 99 F. Supp. 3d 100, 108 (D.D.C. 2015); asking when an employee is going to retire, Perry v. Shinseki, 783 F. Supp. 2d 125, 129, 138 (D.D.C. 2011); and discussing retirement plans with a supervisee. Shipman v. Vilsack, 692 F. Supp. 2d 113, 118 & n.5 (D.D.C. 2010)

Becker and Lee's comments strike the Court as falling somewhere in the middle of this spectrum. They are not as clearly disparaging as the comments found in Robinson or Daniels. But they do not appear wholly innocuous like the factual observations in Johnson or Shipman either. Becker and Lee were trying to usher Anderson out toward retirement, and a clear inference is that he was at the end of his time with the firm. If that sense was derived from stereotypes based on Anderson's age, it would be inappropriate. This leaves a genuine factual dispute over the ultimate import of Becker and Lee's comments, one the Court will leave to be resolved by the trier of fact.

\*      \*      \*

Construing all the evidence in the light most favorable to Anderson, the Court cannot say as a matter of law that age did not play a substantial role in the events detailed in this case. Instead, Plaintiff has compiled sufficient indications of discrimination — affirmative signals of age-based animus alongside evidence that BDO has not been fully honest about the reasons

17

behind Anderson's discharge — to send his case to a jury.  This is not to say that he will ultimately prevail; after all, a jury may disbelieve his account of BDO's expectations or find the absence of explicitly age-related comments to be fatal to his suit.  Even so, based on the record presented, Anderson is "entitled to present his evidence to the jury and [attempt to] persuade the fact finder" of his account.  Propp v. Counterpart Int'l, 39 A.3d 856, 872 (D.C. 2012).

> D.    Punitive Damages

Finally, BDO asserts that even if the case proceeds to trial, the Court should dismiss Anderson's claim for punitive damages.  See MSJ at 33–34.  It sees no reason to do so.  Punitive damages are available under the DCHRA for "all discrimination cases . . . 'subject only to the general principles governing any award of punitive damages.'"  Daka, Inc. v. Breiner, 711 A.2d 86, 98 (D.C. 1998) (quoting Arthur Young & Co. v. Sutherland, 631 A.2d 354, 372 (D.C. 1993)).  BDO articulates no real basis for taking this question away from the jury.

## IV.    Conclusion

The Court, accordingly, will deny Defendant's Motion for Summary Judgment.  An Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  June 9, 2026

18